Nathan J. DUNLAP, Plaintiff–Appellant,

v.

Colorado DEPARTMENT OF CORRECTIONS; and Roger Werholtz, in His Official Capacity As Interim Executive Director of the Department of Corrections, Defendants–Appellees.

No. 12CA0955

Colorado Court of Appeals, Div. VII.

Announced April 25, 2013

Snell & Wilmer L.L.P., James D. Kilroy, Jessica E. Yates, Denver, Colorado, for Plaintiff–Appellant

John W. Suthers, Attorney General, Christopher W. Alber, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees

Opinion by JUDGE J. JONES

JUDGMENT AFFIRMED

¶ 1 Nathan J. Dunlap, a death row inmate in the custody of the Colorado Department of Corrections (DOC), appeals the district court's judgment denying his challenge to the DOC's regulation establishing the procedure for carrying out the death penalty by lethal injection. He contends that the DOC failed to comply with the state Administrative Procedure Act, sections 24–4–101 to –108, C.R.S. 2012(APA), in promulgating the regulation, rendering it invalid. We conclude, however, as did the district court, that, by virtue of section 17–1–111, C.R.S.2012, the regulation is exempt from the portions of the APA on which Mr. Dunlap relies. Accordingly, we affirm the district court's dismissal of Mr. Dunlap's complaint.

## I. Background

¶ 2 Colorado law provides for imposition of the death penalty by lethal injection. § 18–1.3–1202, C.R.S.2012.[1] The implementation of such a sentence is entrusted to the Executive Director of the DOC. § 18–1.3–1204, C.R.S.2012. As relevant here, the Executive Director must provide (1) "a suitable and efficient room or place, enclosed from public view, within the walls of the correctional facility at Canon City"; (2) "all necessary implements requisite for" carrying out the sentence; and (3) "a person ... trained to administer intravenous injections" to perform the execution. *Id.*

¶ 3 The Executive Director promulgated Administrative Regulation 300–14 (the regulation), effective June 1, 2011, "to establish procedures, consistent with Colorado statutes, governing death penalty—executions." Subparagraphs A through J of the regulation

City and County of Denver, District Court No. 11CV4649, Honorable Norman D. Haglund, Judge

1. "Lethal injection" is statutorily defined as "a continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death." *Id.*

address, among other things, where executions are to take place, where condemned inmates must be housed, the timing of an execution upon receipt of a warrant for execution, visitor access to condemned inmates, anonymity of members of the lethal injection team, post-execution examination of executed inmates, and "procedures and guidelines for carrying out a death sentence by lethal injection."[2] The specific procedures and guidelines for carrying out a death sentence are included in a "restricted distribution document," identified in subparagraph K, that is to be distributed to DOC employees "on a need-to-know basis."[3]

¶ 4 Mr. Dunlap is a DOC inmate who was sentenced to death for murdering four people at a Chuck E. Cheese restaurant in Aurora, Colorado, in 1993. *See Dunlap v. People,* 173 P.3d 1054, 1061 (Colo.2007); *People v. Dunlap,* 975 P.2d 723, 733–35 (Colo.1999). He is incarcerated at the DOC's Sterling Correctional Facility. He has exhausted his state and federal appeals. *See Dunlap v. Clements,* 476 Fed.Appx. 162 (10th Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 1244, 185 L.Ed.2d 191 (2013); *Dunlap,* 173 P.3d 1054, *cert. denied,* 552 U.S. 1105, 128 S.Ct. 882, 169 L.Ed.2d 740 (2008); *Dunlap,* 975 P.2d 723, *cert. denied,* 528 U.S. 893, 120 S.Ct. 221, 145 L.Ed.2d 186 (1999).

¶ 5 Shortly after the effective date of the regulation, Mr. Dunlap filed a complaint in district court under subsection 24–4–106(4), C.R.S.2012, of the APA, claiming that the DOC had violated the APA in promulgating the regulation, and seeking a declaratory judgment that the regulation is invalid and that the DOC must comply with the APA in promulgating any regulation pertaining to executions or lethal injections.[4] Specifically,

Mr. Dunlap alleged that the DOC had failed to comply with the rule-making procedures of section 24–4–103, C.R.S.2012.

¶ 6 Defendants moved to dismiss the complaint under C.R.C.P. 12(b)(1) (lack of subject matter jurisdiction) and (5) (failure to state a claim). They based their contention of lack of subject matter jurisdiction on section 17–1–111, which provides as follows:

> The provisions of this title relating to the placement, assignment, management, discipline, and classification of inmates shall not be subject to section 24–4–103, 24–4–105, or 24–4–106, C.R.S.

Because the regulation is exempt from the procedural requirements of section 24–4–103 of the APA, they argued, the court lacked jurisdiction to review the regulation under subsection 24–4–106(4).

¶ 7 The district court granted defendants' motion to dismiss for lack of subject matter jurisdiction. The court concluded that the regulation pertained to the Executive Director's "management" of inmates within the meaning of section 17–1–111 because it concerned a matter within the Executive Director's duties set forth in section 17–1–103, C.R.S.2012. Having concluded that it lacked jurisdiction over Mr. Dunlap's complaint, the court declined to rule on defendants' motion to dismiss for failure to state a claim.[5]

## II. Discussion

¶ 8 Mr. Dunlap contends that section 17–1–111 does not apply to the regulation because (1) the Executive Director's statutory authority to administer the death penalty is found in title 18 of the Colorado Revised Statutes, not "this title" (i.e., title 17) as he claims is

---

2. Several of these provisions parrot statutory directives pertaining to death sentences.

3. We assume, as do the parties, that the restricted distribution document addresses such matters as the chemical(s) to be used, dosages to be used, and manner of injection. Mr. Dunlap has not requested that he be permitted to review the document, and he has not requested that any court be permitted to review the document. His challenge in this case is limited to a single contention -- that any regulation pertaining to administering the death penalty must comply with the notice and comment procedures of the APA.

4. The complaint also names Tom Clements, the former Executive Director of the DOC, as a defendant. Pursuant to C.A.R. 43(c)(1), we have substituted Roger Werholtz, the Interim Executive Director, as a party.

5. Defendants' motion to dismiss for failure to state a claim was based on Mr. Dunlap's failure to exhaust administrative remedies, as allegedly required by section 13–17.5–102.3, C.R.S.2012.

required by section 17–1–111; and (2) the regulation does not relate to "the placement, assignment, management, discipline, and classification of inmates." We reject these contentions.[6]

### A. Standard of Review

 ¶ 9 Mr. Dunlap's contentions present issues of statutory construction. We review such issues de novo. *Dubois v. People,* 211 P.3d 41, 43 (Colo.2009).

¶ 10 In construing a statute, our overriding goals are to determine and give effect to the General Assembly's intent. *People v. Goodale,* 78 P.3d 1103, 1107 (Colo.2003). To do so, we first look to the statute's plain language, giving the words and phrases therein their plain and ordinary meanings. *People v. Perez,* 238 P.3d 665, 669 (Colo.2010); *People v. Green,* 2012 COA 68, ¶ 23, 296 P.3d 260. And we must read the statutory language at issue in the context of the statute as a whole and the context of the entire statutory scheme. *People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986); *see also People v. Smith,* 254 P.3d 1158, 1161 (Colo.2011) (court must consider the statutory scheme "as a whole, giving consistent, harmonious, and sensible effect to all its parts"). If we determine that the statutory language is unambiguous, we enforce the statute as written, without resorting to other rules of statutory construction. *Dubois,* 211 P.3d at 43; *Goodale,* 78 P.3d at 1107.

### B. "This Title"

 ¶ 11 Contrary to Mr. Dunlap's contention, the fact that the General Assembly placed the statutes authorizing imposition of the death penalty by lethal injection and authorizing the Executive Director to carry out death sentences in title 18 does not mean the regulation is unrelated to the provisions of title 17. Virtually all sentencing provisions relating to criminal offenses are contained in title 18. But title 17 includes broad and extensive provisions concerning the authority of the Executive Director (and war-

dens serving under the supervision and control of the Executive Director) to administer sentences imposed by the courts. *See, e.g.,* §§ 17–1–103, 17–1–105, 17–1–108, 17–1–109, C.R.S.2012. Thus, the fact that the source of the authority to carry out a death sentence is found in section 18–1.3–1204 is not dispositive of whether the regulation relates to a matter within title 17.

### C. Management of Inmates

 ¶ 12 Mr. Dunlap contends that the phrase "placement, assignment, management, discipline, and classification of inmates" in section 17–1–111 is limited to "the custodial treatment of inmates in facilities—which has nothing to do with the implementation of a judicial sentence of death." Mr. Dunlap's contention is unpersuasive because it fails to give effect both to the complete statutory context and to the plain meaning of the relevant statutes.

¶ 13 Section 17–1–103 obligates the Executive Director to, as relevant here, "manage, supervise, and control" the state's correctional institutions, and "[t]o develop policies and procedures governing the operation of the [DOC]." These duties are undeniably broad, and we conclude that, read in context of the entirety of title 17, they plainly encompass determinations concerning the conditions under which sentences served by DOC inmates are to be carried out. We see nothing in the plain language of these broadly phrased provisions that would exempt death sentences from their ambit.

¶ 14 Therefore, we conclude that the plain language of section 17–1–111 includes the regulation. Having so concluded, we do not consider the carefully selected legislative history on which Mr. Dunlap relies (which, in any event, casts no doubt on our interpretation of section 17–1–111). Nor do we accept Mr. Dunlap's invitation to construe the relevant statutes based on what he contends are important policy concerns. *See Bd. of Cnty. Comm'rs v. Colo. Dep't of Pub. Health & Env't,* 218 P.3d 336, 343 n. 11 (Colo.2009)

---

6. The district court found that the regulation is a "rule" as defined by subsection 24–4–102(15), C.R.S.2012, of the APA. Though defendants do not concede that is the case, they did not cross-

appeal that ruling. Therefore, the only question here is whether the regulation is exempt from APA rule-making procedures by virtue of section 17–1–111.

(public policy concerns are properly addressed to the General Assembly); *see also Scoggins v. Unigard Ins. Co.*, 869 P.2d 202, 205 (Colo.1994) ("We will not judicially legislate by reading a statute to accomplish something the plain language does not suggest, warrant[,] or mandate.").

¶ 15 In arguing that the notice and comment procedures of the APA apply to the regulation, Mr. Dunlap cites the fact that a portion of the regulation is included in the "restricted distribution document." But his purpose in doing so is unclear. He has not asked to be allowed to review it, has not asked that any court be allowed to review it, and has not asserted any challenge to it apart from his challenge to the regulation as a whole under the APA. We do not express any opinion on whether any other challenge to that portion of the regulation is either procedurally or substantively available to Mr. Dunlap.

¶ 16 The judgment is affirmed.

Judge PLANK * concurs

Judge RICHMAN concurs in part and dissents in part

JUDGE RICHMAN concurring in part and dissenting in part.

¶ 17 I concur with the majority's conclusion that the procedures expressly set forth in AR 300–14 (procedures in subparagraphs A through J) are matters that come within the DOC's management of inmates, and therefore the adoption of the regulation as to those matters is exempt from the rulemaking provisions of the APA pursuant to section 17–1–111, C.R.S.2012. And, as to the "restricted distribution document" referred to in subparagraph K of AR 300–14, I agree that the majority does not express any opinion on whether any other challenge to that regulation is procedurally or substantively available.

¶ 18 However, I do not believe the restricted distribution document (subparagraph K)

concerns the management of inmates within the meaning of section 17–1–111.

¶ 19 According to AR 300–14, the restricted distribution document referenced in subparagraph K provides "the procedures and guidelines for carrying out a death sentence by lethal injection." The fact that the procedures are not disclosed in the regulation— nor were they disclosed to the courts that have decided this case, or even the assistant attorney general who represents the DOC— makes it particularly troublesome for us to make an informed decision as to whether its content constitutes the management of inmates, as do subparagraphs A through J of AR 300–14.

¶ 20 Moreover, to the extent we can discern the subject matter of the restricted distribution document, in my view, the establishment of procedures for carrying out a death sentence by lethal injection cannot simply be treated under the rubric of "management" of inmates.

¶ 21 The statute that authorizes the death penalty by means of lethal injection provides that " 'lethal injection' means a continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death." § 18–1.3–1202, C.R.S.2012. Although sections 18–1.3–1204 through –1207, C.R.S.2012, provide additional procedures for carrying out executions, they do not detail how the lethal injection is to be administered, other than by requiring that the injection be administered by a person selected and trained to administer intravenous injections. § 18–1.3–1204.

¶ 22 Thus, although we do not know the contents of the "restricted distribution document," we may assume, as the majority does, that the document sets forth what constitutes a "lethal quantity" and describes what constitutes an "equally or more effective substance sufficient to cause death." If it does, in my view the exemption in section 17–1–111 for a regulation relating to "management" of inmates does not, and should not, exempt regu-

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2012.

lations relating to those issues from the procedures of the APA.

¶ 23 Section 17–1–111 exempts from the APA the making of rules relating to "placement, assignment, management, discipline and classification of inmates." I understand this plain language as addressing the routine administrative functions of operating a prison system that are set forth elsewhere in title 17. However, the mechanics for carrying out the extremely rare and terminal sentence of death cannot be compared to the routine of administering an ordinary prison sentence. *See Powell v. Colo. Public Utilities Comm'n,* 956 P.2d 608, 614 (Colo.1998) ("[A]bsent a statutory or constitutional violation, courts generally do not intervene in matters of prison administration and defer to the DOC in the management of penal institutions.").

¶ 24 One of the purposes of the APA is to ensure that state agencies do not restrict the freedom of any persons contrary to the public interest, *see* § 24–4–101.5, C.R.S.2012, and to permit public input and comment on proposed rules being considered by the agencies of our state government. *See* § 24–4–103, C.R.S.2012. The method of carrying out a death sentence by lethal injection is a matter of public interest and a matter on which the public should have the opportunity for input.

¶ 25 Therefore, I would reverse that portion of the district court's order insofar as it relates to subparagraph K of AR 300–14 (the restricted distribution document) and remand the case to the district court to direct the DOC to disclose to it the contents of the document, so that it may more fully consider whether the content of that document constitutes management of inmates within the meaning of section 17–1–111.

¶ 26 If, as we have assumed, the restricted distribution document addresses what constitutes a "lethal quantity" and describes what constitutes an "equally or more effective substance sufficient to cause death," I would conclude that portion of AR 300–14 is not exempt under section 17–1–111 from compliance with the rulemaking provisions of the APA.